MADELEINE M. LANDRIEU, Judge.
| plaintiffs, Beebe’s on the Lake, LLC, [“Beebe’s”] Christopher Macaluso and Brenda Macaluso Newman, appeal the trial court’s judgment dismissing their claims with prejudice after trial on the merits. For the reasons that follow, we affirm.
FACTS AND PROCEEDINGS BELOW
On June 30, 2007, Christopher Macaluso, on behalf of his limited liability company Beebe’s, entered into a written agreement with David Skansi to lease the ground floor of Mr. Skansi’s building at 7224 Pontchartrain Boulevard for the purpose of operating a jazz club and restaurant. In August of 2007, Mr. Macaluso opened his club/restaurant, Beebe’s on the Lake. Sometime in early January, 2009, after operating Beebe’s for approximately a year and a half, Mr. Macaluso posted a sign on the door informing his patrons that Beebe’s would be closed for a two-week vacation. The parties dispute what happened thereafter. It is undisputed that Beebe’s never reopened. On or about February 5, 2009, Mr. Skansi tacked a notice of eviction to the door of Beebe’s, which was followed by formal eviction 12three weeks later.[1] On February 10, 2009, Mr. Macaluso, his mother Brenda Macaluso Newman,[2] and Beebe’s filed suit against Mr. Skansi[3] alleging wrongful eviction, breach of the lease, trespass, conversion and various intentional torts. Mr. Skansi filed a reconventional demand claiming the plaintiffs had abandoned the leased premises while owing him rent and other expenses. Mr. Skansi asserted his right to exercise a lessor’s lien over certain movables left on the premises, and prayed *632 for judgment against the plaintiffs “in an amount to be determined by” the trial court.
The matter was tried by the district court on July 20-21, 2011. On December 15, 2011, the trial court rendered judgment dismissing with prejudice all the plaintiffs’ claims against Mr. Skansi; denying Mr. Skansi’s reconventional demand insofar as it sought any amount beyond what he had already retained pursuant to his lessor’s lien; and denying both parties’ requests for attorney’s fees. The trial court also issued written Reasons for Judgment. The trial court found that the evidence, specifically Mr. Macaluso’s behavior and the email communications between him and Mr. Skansi, belied Mr. Macaluso’s attempt to prove that he did not owe any rent arrearages but had actually overpaid. The trial court also found that the evidence failed to support Mr. Macaluso’s claim that he had been wrongfully evicted. Finally, the trial court found that there was insufficient | .¡evidence to support the plaintiffs’ claims that Mr. Skansi had violated the lease or had intentionally converted the leased property to his own use.
The plaintiffs appeal the judgment. Mr. Skansi filed an answer to the appeal challenging the trial court’s denial of his recon-ventional demand and the denial of his request for attorney’s fees. Because the answer to the appeal was not filed timely, the issues raised by Mr. Skansi are not properly before this court and therefore have not been considered.[4]
ISSUES
Plaintiffs assert nine assignments of error. For the following reasons, we address only four of those assignments.
The primary issue on appeal is whether the trial court erred by concluding that the termination of the lease and the eviction of Beebe’s was proper under the law. The plaintiffs’ first three assignments of error challenge that conclusion of the trial court by questioning the factual findings upon which the conclusion was based, namely: (1) that Mr. Macaluso violated the terms of the lease by failing to timely pay rent and utilities; (2) that Mr. Skansi did not breach the lease by denying entry to Mr. Macaluso or locking him out; and (3) that Mr. Macaluso abandoned the lease, and therefore, Mr. Skansi did not breach the lease by failing to provide thirty days written notice by certified mail of Mr. Macalu-so’s default prior to eviction. In addition to these assignments, we also address the plaintiffs’ |4fifth assignment of error, by which they contend that the trial court wrongfully failed to award damages to Brenda Newman for the loss of her equipment that was left on the leased premises.
We do not address the plaintiffs’ fourth assignment of error, which raises an issue regarding the propriety of Mr. Skan-si’s acting on behalf of his ex-wife Laura Skansi. At the time in question, Ms. Skansi co-owned the building but did not sign the lease. That issue cannot be considered by this court because the trial court did not address it, and because the only party that would have standing to raise the issue is Laura Skansi, who is not a party to the district court suit or the appeal.[5]
*633 The remaining assignments of error (Nos. 6, 7, 8 and 9) relate to damages, costs and attorney fees to which the appellants contend they are entitled in the event this court reverses the trial court’s judgment on the merits. Our affirmation of the judgment moots those issues.
STANDARD OF REVIEW
The lease agreement in this case is not ambiguous, nor is its interpretation at issue. The trial court reached its conclusion by applying the terms of the lease to the facts that it found were supported by the preponderance of the evidence. Because the appellants assign error to these factual findings, the appropriate appellate standard of review is manifest error. See Jerome v. Dep’t of Police, 2008-0916 (La.App. 4 Cir. 1/28/09), 4 So.3d 896, 897.
|,DISCUSSION

I. Breach of Lease/ Wrongful Eviction (Assignments of Error 1-3)

The primary witnesses at trial on these issues were Mr. Macaluso and Mr. Skansi, whose versions of the facts differed substantially. As reflected in the Reasons for Judgment, the trial court found Mr. Skan-si’s version of the facts to be more credible largely because it was supported by the objective evidence of the emails and telephone messages exchanged by the parties.
Mr. Skansi testified that in 2007, he met with Mr. Macaluso four or five times to negotiate the lease. Then, prior to signing the lease, he and Mr. Macaluso had lunch with Mr. Skansi’s ex-wife, Laura, who orally agreed to lease the property to Mr. Macaluso.[6] By December of 2008, Mr. Macaluso had missed three of four rent payments, as reflected by the email communications between him and Mr. Skansi. As a result, Mr. Macaluso suggested that Mr. Skansi select some of the valuable art work owned by Mr. Macaluso to hold as security for the unpaid rent. On December 15, Mr. Skansi selected two paintings and took them for this purpose. Mr. Skansi testified that on January 6, 2009, he was in his office working when the electricity was turned off in the building.[7] Mr. Skansi immediately called Mr. Macaluso. Mr. Macaluso, who was out of town but did not reveal this fact, had no explanation for the electricity being off, but he asked Mr. Skanski for permission for two female employees of Beebe’s to come in the next Ifiday to remove perishable food stored in the freezer. Mr. Skansi did not realize until the next day, when he first noticed a sign to this effect on Beebe’s front door, that Beebe’s had closed for a two-week vacation beginning January 3rd.
After speaking with Mr. Macaluso, Mr. Skansi had his secretary contact the utility company, Entergy. Entergy informed her that the power had been disconnected due to nonpayment of the bill, and it would cost approximately $1,100 to have it reconnected. Mr. Skansi had the electricity changed back to his name and paid to have the power reinstated. He let the two females into the building the next day at *634 about 5:30 p.m., and left with them still on the premises. When he returned to the building at 8:30 a.m. the following morning, he could not get inside because the locks had been changed. Mr. Skansi immediately called Mr. Macaluso and expressed his fear that an unauthorized person, perhaps one of the two females who had come in earlier, had changed the locks. Mr. Skansi informed Mr. Macaluso that, for security purposes, he was going to have the locks changed again and the restaurant boarded up, which he proceeded to do.
Mr. Skansi testified that he next heard from Mr. Macaluso on January 10, when he received the following email message, which was introduced into evidence:
David:
Thanks for talking with me today. To recap our conversation, I’ve had it with Beebe’s and I need to close in order to avert bankruptcy and/ or a coronary. As you stated, the monies I owe you are around Ilk and it is my intent to pay this debt. I understand Melissa [Melissa Gehring, Mr. Skansi’s secretary] will send me an itemized hard number via email this week on what I owe you. Also, as we discussed I will get an appraiser in |7their [sic] this week to declare a value on the equipment I own. At that point, I am willing to either sell the equipment or leave it in the building if it makes it easier for you to rent the space and have the equipment bought by the new leaser. I will need to get in the building this week to have the video poker machines removed. I need to do this or face uncomfortable consequences from the state. I will stay in touch with you and let you know how things are progressing. Once again, thanks for the opportunity and I wish it had worked out.
Mac
Mr. Skansi further testified that Mr. Ma-caluso never requested another key or attempted to get back into the building after that. He stated that when he changed the locks, he had no intent to lock Mr. Macalu-so out; in fact, he continued to let delivery people into Beebe’s. Mr. Skansi also testified that he owned all the equipment in the building and leased it, along with the premises, to Mr. Macaluso, as was detailed in Exhibit A attached to the lease. He testified that he leased the equipment without charge because he felt sorry for Mr. Macaluso in the wake of Hurricane Katrina. Mr. Skansi stated that he viewed Mr. Macaluso’s January 10th email as notice that Mr. Macaluso was abandoning the lease. He testified that Beebe’s had been losing money every month, but that he had agreed in late 2008 to give Mr. Macaluso another shot at least until after the Christmas season, even though he was behind in the rent. In view of Mr. Macaluso’s decision to terminate the lease on January 10th, Mr. Skansi did not believe it was necessary to provide Mr. Macaluso with a notice of default. Mr. Skansi did not respond to the January 10th email.
According to Mr. Skansi, on January 15, 2009, Mr. Macaluso asked if he and a potential new partner, Ray Newman, could meet with Mr. Skansi | ^regarding confect-ing a new lease. Mr. Skansi agreed, and the meeting occurred at Mr. Skansi’s office on Wednesday, January 21. At that meeting, Mr. Skansi’s secretary produced a computer printout showing that the total amount of rent arrearages and other expenses owed by Mr. Macaluso to Mr. Skansi was $14,500. Mr. Macaluso and Mr. Newman proposed to pay this amount and to put the electricity back in Mr. Macaluso’s name in exchange for signing a new lease. Mr. Skansi testified that he told them he would have to think about *635 their proposal and consult his former wife, Laura, before making a decision.
However, that same afternoon Mr. Ma-caluso left a voicemail message on the answering machine of Mr. Skansi’s secretary informing her that he and Mr. Newman had already gone to Entergy and found out that the name on the account could be changed as soon as Friday (two days from the date of the meeting), which would prevent Mr. Macaluso from having to remove the video poker machines. Mr. Macaluso also sent Mr. Skansi an email the next day, Thursday, begging him to accept the new proposal. That email reads, in pertinent part: “i don’t mind signing a new agreement, but please don’t kick me when i’m down trying to recover [sic].” Mr. Skansi immediately responded with an email saying he was “still not getting the warm fuzzy feeling about a new arrangement,” but he was thinking about some additional things he would require if he were to agree to a new lease.
Later that day, however, Mr. Skansi became angry when he learned of the telephone message that had been left for his secretary the day before. At 5:80 p.m. on that Thursday, January 22, Mr. Skansi sent another email, [9which expressed his displeasure that Mr. Macaluso and Mr. Newman had already inquired about having the name changed on the electrical service account. That email reads, in pertinent part: “I told you guys not to count on anything until I thought about it and talked to my former wife.... But, based upon the above and looking at how much work this lease arrangement creates for me, I am not interested in starting over with you guys.... Let this be your notice of termination.”
On February 5, 2009, Mr. Skansi sent Mr. Macaluso an email informing him he was beginning the formal eviction process. That same day, he had a notice of eviction [8] attached to the door of Beebe’s, followed by formal eviction 8 weeks later. Mr. Skansi testified that he never received a check for $14,500 signed by Mr. Newman. He farther testified that he still held two paintings he had accepted from Mr. Macaluso in December, 2008, as security for his debt, and that he was willing to keep those in exchange for the $14,500 Mr. Macaluso owed him. He stated that neither Chris Macaluso nor his mother, Brenda Newman, had ever asked to get into the building to retrieve any equipment, although he had allowed other Beebe’s em-ployeés who had asked to go in and get various items that belonged to them.
Mr. Macaluso’s testimony varies significantly from that of Mr. Skansi. According to Mr. Macaluso, he first learned that the electricity to the building had been turned off when he received a phone call from the 110manager of Beebe’s, Mark D’Amico, a day or so before Mr. Skansi called to tell him about the power being off. Mr. Maca-luso further testified that he told Mr. Skansi that he would call Entergy himself, which he did. He stated that the Entergy representative told him Beebe’s owed $4,000.00. When Mr. Macaluso called Mr. Skansi back and gave him that information, Mr. Skansi demanded the whole amount, which Mr. Macaluso did not have. Mr. Macaluso denied that he asked permission from Mr. Skansi for two female employees to enter the building, stating that he did not need such permission. He testified that the two employees who went in only took perishable food; they did not change the locks.
Mr. Macaluso denied at trial that Mr. Skansi had told him he was having the *636 locks changed again for security purposes. However, this statement was contradicted by Mr. Macaluso’s deposition testimony. Mr. Macaluso introduced various cancelled cheeks in an effort to prove that he was not behind on his rent payments, but had actually paid more rent than he owed. He indicated that many of his payments, both cash and check, weren’t credited because he made the payments to Laura Skansi under an arrangement she had with David Skansi. He also testified that Laura Skan-si had held a luncheon at Beebe’s during the Christmas holidays and that David Skansi had hosted a New Year’s Eve party there, the tabs for which ($1750 and $600, respectively) were supposed to be deducted from his rental obligation. Despite claiming he was not in arrears, however, Mr. Macaluso acknowledged that in December of 2008 he had offered Mr. Skansi some valuable artwork to hold as security for his debt, and that Mr. Skansi had [1Taccepted that offer and had taken two paintings on December 15th. Mr. Macalu-so also acknowledged that the equipment located on the premises was already there when he took over the lease. Mr. Macalu-so did not produce any profit or loss statements relating to Beebe’s.
Mr. Macaluso was unable to explain his January 10th email, in which he acknowledged that he owed Mr. Skansi at least $11,000 and stated that he was “giving up” on Beebe’s, other than to say he was “stressed out” when he sent the email. Regarding the January 15, 2009 letter to Mr. Skansi written on Mr. Macaluso’s behalf by his attorney, which similarly acknowledged that Mr. Macaluso owed at least $11,000 in back rent and asked for a meeting to discuss a new deal, Mr. Macalu-so testified that the purpose of that letter was simply to get back into the building. He further testified that at the January 21st meeting, he heard Mr. Skansi say he would have to consult Laura Skansi before he could agree to anything, but he nevertheless assumed the deal was done because he believed Laura Skansi would consent to the new arrangement.
Additional witnesses who testified concerning the events that preceded the eviction were Mr. Skansi’s ex-wife, Laura; his secretary, Melissa Gehring; Ray Newman; and Beebe’s manager Mark D’Amico. Laura Skansi confirmed her ex-husband’s testimony that she had agreed to lease the co-owned property to Mr. Macaluso. She further testified that she thought she had signed the lease but could not prove it. She testified that she often accepted rent payments from Mr. Macaluso, some in the form of checks and some cash. She did not testify that Mr. Macaluso had overpaid 112his rent. In fact, she stated that she knew the rent was in arrears in January of 2009, but could not say by how much. She stated that she would not have evicted Beebe’s.
Ms. Gehring corroborated Mr. Skansi’s testimony as to the events that occurred. She testified that when the power was turned off in early January, she had arranged with Entergy to have the name on the account switched from Beebe’s to Mr. Skansi and had paid approximately $1100 to have the electrical power restored to the building. She stated that she kept monthly records of the rent payments, and that beginning in March of 2008, Beebe’s was frequently behind in paying its rent. When Beebe’s missed a payment, she would call and email Mr. Macaluso. She would then record when he paid and the amounts paid, including when those payments were made to Laura Skansi. Ms. Gehring testified that, according to her recollection, Beebe’s was in arrears by $11,000 in December, 2008, and by approximately $14,000 in January, 2009. Ms. Gehring stated that the printout of the spreadsheet she distributed at the January *637 21st meeting had not been created by her that day, but was a running tally that reflected the information she had entered over the course of the lease. She confirmed that the parties had not reached an agreement by the conclusion of that meeting. She also identified the voicemail left on her telephone answering machine that same afternoon from Mr. Macaluso informing her that he and Mr. Newman had gone to Entergy and inquired about how soon the account could be switched back into Beebe’s name. Ms. Gehring stated that she specifically remembered Mr. Skansi having told Mr. Macaluso and Mr. 11sNewman at the meeting that they were not to do anything at all with Entergy.
Ray Newman testified that he was present at the January 21st meeting and that he heard Mr. Skansi say he had to speak to Laura before deciding whether to accept the proposed new deal. He confirmed that he and Chris Macaluso believed Ms. Skan-si would approve the deal, so they proceeded accordingly. He further testified that after the meeting, he wrote a check to Mr. Skansi for $14,500 in order “to help Chris” and delivered it to Mr. Skansi’s attorney on January 22, but the check was never cashed.
In view of the evidence, we find no manifest error in the trial court’s ruling that Mr. Skansi was entitled to evict Mr. Macaluso. First, there clearly was sufficient evidence for a reasonable trier of fact to have concluded that in early January, 2009, Beebe’s was not only in arrears as to its rent but also had failed to pay the utilities timely as it was obligated to do under the lease.
According to the lease, the tenant’s failure to meet either of these obligations is a default sufficient for the landlord to terminate the lease if proper notice is given. The lease states that in the event the tenant defaults and:
Tenant fails to cure any of said defaults within thirty (30) calendar days after giving of notice thereof by Landlord to Tenant, then in said events or any of them, Landlord may, at Landlord’s option exercise any of the following rights and remedies: (1) Landlord may terminate this lease by giving notice of such election to Tenant, and Tenant waives any and all rights it may have to receive notice to vacate the Premises....
| ^Another provision of the lease specifies:
All notices hereunder shall be in writing. All notices to Tenant shall be sent by hand or by certified mail addressed to Tenant at 7224 Pontchartrain Boulevard, New Orleans, LA 70124.
Mr. Skansi admits that he did not provide Mr. Macaluso with notice of default by certified mail as stipulated in the lease.[9] For this reason, the plaintiffs argue that Mr. Skansi had no right to evict Beebe’s. This argument ignores the January 10, 2009 email from Mr. Macaluso to Mr. Skansi in which Mr. Macaluso clearly states he is giving up on the lease. It constitutes a default under the lease if the tenant “abandons, vacates or illegally uses the Premises ...” However, the lease does not specifically address the consequences of the tenant’s abandoning the lease itself. In the January 10th email, Mr. Macaluso not only acknowledges that he is in default under the lease, but also expresses his desire to give up on the lease because of his inability to cure the default. In view of this email, we find that Mr. Macaluso himself terminated the lease. We therefore conclude that the trial court did not err by *638 concluding that the lease was terminated and there was no wrongful eviction.

II. Claim of Brenda Macaluso Newman (Assignment of Error 5)

The plaintiffs argue that the trial court erred by failing to award Brenda Newman damages for the loss of her musical equipment that she left on the leased premises. However, the lease provides that the landlord has a lien on all movables “belonging to Tenant and or located on or in the Premises” (emphasis added) for the payment of rent and all other charges due under the lease. This language |1Bclearly indicates that the landlord’s lien can extend to movables that do not belong to the tenant if those movables were left on the premises. The trial court specifically found that Mr. Skansi was adequately compensated for the tenant’s arrearages by his lessor’s privilege and his retaining of the two paintings he held as security. Therefore, we find no manifest error in the trial court’s denial of Ms. Newman’s claim.
CONCLUSION
Accordingly, for the reasons stated, we affirm the judgment of the trial court.
AFFIRMED

. Mr. Skansi leased the premises to a third party in June of 2009.

. Ms. Newman, a musician who regularly performed at Beebe’s, sought damages for Mr. Skansi's alleged conversion of musical equipment belonging to her that she had left on the leased premises.

.A second named defendant, Kyle Walker, an employee of Mr. Skansi, was voluntarily dismissed by the plaintiffs just prior to trial.

. La. C.C.P. art. 2133 provides, in pertinent part, that an appellee who desires to have the judgment modified, revised or reversed in part, or who seeks damages beyond those awarded by the trial court, "must file an answer to the appeal, stating the relief demanded, not later than fifteen days after ... the lodging of the record.” The record was lodged in this case on May 7, 2012. The answer was filed on June 15, 2012. The answer is therefore untimely.

. The only copy of the lease produced by the parties lacked Laura Skansi's signature. Laura Skansi testified that she thought she had *633 signed the lease, but did not really remember, she also testified that she had agreed with Mr. Skansi to lease the premises to Beebe’s.

. Mr. Skansi explained that although he and Laura had separated, the community property between them, which included the property at issue, had not been partitioned. He testified that he did not know why Laura had not signed the lease that was admitted into evidence.

. Mr. Skansi operated his shipping business out of an office located on the second floor of the building; Beebe’s leased the remainder of the building, with the restaurant being located on the first floor. According to the lease, the lessee, Beebe's, was responsible for paying the electricity bill because there was only one meter for the building.

. The evidence demonstrated that this notice was a 5-day notice to vacate. Five days later, on February 10, Mr. Macaluso filed the instant lawsuit.

. We note, however, that Mr. Skansi’s January 22, 2009 email stating that the tenant should consider it his formal notice of termination occurred more than thirty days prior to the formal eviction.